UNITED STATES of America for and on Behalf of DELTA METALS, INC., Plaintiff,

v.

R. M. WELLS COMPANY, INC. and North River Insurance Company, Defendants.

Civ. A. No. 178–198.

United States District Court,
S. D. Georgia,
Augusta Division.

Sept. 24, 1980.

David E. Hudson, Augusta, Ga., for plaintiff.

Rodney C. Jones, Atlanta, Ga., for defendants.

## ORDER

BOWEN, District Judge.

Defendant, R. M. Wells Company, Inc. [Wells], contracted with the Veterans Administration to renovate and air condition four hospital buildings at the Veterans Administration Lenwood Hospital in Augusta, Georgia. Pursuant to 40 U.S.C. § 270a(a)(2) (1976), Wells executed a payment bond with North River Insurance Company [North River] for the protection of all persons supplying labor and material to the project. Thereafter, Wells entered into a subcontract with use plaintiff, Delta Metals, Inc. [Delta], for the construction and installation of ductwork on the project. Delta performed the work under this contract from the fall of 1976 through the spring of 1978.

Delta brought this action against Wells and its surety North River alleging that it performed extra work and incurred extra expenses at the direction and with the approval of Wells for which Delta has not been compensated. The complaint contains two counts framed in the alternative. Count I seeks damages amounting to $199,976.79 for the "reasonable direct cost, profit and overhead in performing the extra work." Count II seeks the reasonable value of the extra work which, as computed on a total cost approach, is $199,244.37.

Currently pending in this action is the motion of defendants Wells and North River to strike certain damages claimed in Count I of plaintiff's complaint and to dismiss Count II. The Court heard oral arguments and received supplemental memoranda from both sides.

### I

In a revised claim presented to defendants on December 27, 1979, plaintiff specified the damages sought in Count I. The revised claim comprises four schedules. Schedule I is the primary claim; it itemizes some thirty–nine unprocessed change orders for alleged extra work performed by Delta. Supplementing these costs is a claim, set forth in Schedule II, for extra equipment expenditures. Combining Schedules I and II yields a total base claim of $107,804.43 for work performed by Delta allegedly beyond the scope of their contract.

Defendant's motion to strike challenges the propriety of damages sought in Schedules III and IV. Schedule III, entitled "General Overhead Charges to Unpaid Changes," computes the percentages of operating expenses for Delta's completed contracts in the years 1976 through 1978 and applies these percentages to the amounts claimed due for corresponding years in Schedules I and II. Thus, operating expenses for 1976 amounted to 18.411% of the total cost of completed contracts; factoring this percentage into plaintiff's base claim of $7,025.98 for fiscal year 1976 yields a sum of $1,293.55 for general overhead. Similarly the percentages for fiscal years 1977 and 1978 were 22.308% and 13.143% respectively, producing a total charge for general overhead of $22,149.33.

Schedule IV provides a breakdown of costs claimed for extended job site overhead and expenses incurred by Delta in performing the alleged extra work. Twelve categories are included: rubbish removal, drawings and shop supervision, photos, office supplies, telephone, Western Union, truck trips to Augusta, equipment, expendable tools and related items from suppliers, professional fees and related expenses, expendable tools and related items from stock and petty cash expense. The total amount claimed is $22,941.04.

The final two components of damages sought in Count I are profit and prejudgment interest. Delta claims a profit of 10% for each year on the total amounts of Schedules I through IV. Plaintiff further seeks prejudgment interest amounting to $32,892.52. When profit and prejudgment interest are added to the subtotals of Schedules I through IV, the total damages to December 31, 1979, presented in Count I amount to $199,976.79.

Defendants argue that recovery of certain of these amounts is precluded by limitation provisions in the prime contract between Wells and the Veterans Administration which allegedly apply to Delta through an incorporation clause in its subcontract. The prime contract contains the standard changes clause which provides in pertinent part:

(a) The Contracting Officer may, at any time, without notice to the sureties, by written order designated or indicated to be a change order, make any change in the work within the general scope of the contract, including but not limited to changes:

(1) In the specifications (including drawings and designs);

(2) In the method or manner of performance of the work;

(3) In the Government–furnished facilities, equipment, materials, services, or site; or

(4) Directing acceleration in the performance of the work.

(b) Any other written order or an oral order (which terms as used in this paragraph (b) shall include direction, instruction, interpretation, or determination) from the Contracting Officer, which causes any such change, shall be treated as a change order under this clause, provided that the Contractor gives the Contracting Officer written notice stating the date, circumstances, and source of the order and that the Contractor regards the order as a change order.

Clause 3, General Provisions of the prime contract, Federal Procurement Regulation, 41 C.F.R. § 1–7.602–3 (1979). This clause enables the government to make unilateral changes, provided the changes are within the general scope of the contract, and affords the contractor commensurate compensation through an "equitable adjustment" provision.[1] *Id.* subparts (d), (e).

Supplementing the changes clause at G–10A of the prime contract are limitations on payments for extra work. Of relevance to the instant case are two subparagraphs of this supplement. G–10A4 restricts allowances for overhead and profit.[2] G–10A9

---

**1.** A claim may not be redressable under the Changes clause if it amounts to a cardinal change. *See generally* Nash & Cibinic, *The Changes Clause in Federal Construction Contracts*, 35 Geo.Wash.L.Rev. 908, 910–11 (1967). As explained by the United States Court of Claims in *Edward R. Marden Corp. v. United States*, 442 F.2d 364, 369, 194 Ct.Cl. 799 (1971):

The cardinal change doctrine is not a rigid one. Its purpose is to provide a breach remedy for contractors who are directed by the Government to perform work which is not within the general scope of the contract. In other words, a cardinal change is one which, because it fundamentally alters the contrac-

tual undertaking of the contractor, is not comprehended by the normal Changes clause.

**2.** G–10A4 provides in full:

Allowances not to exceed 10 percent each for overhead and profit for the party performing the work will be based upon the value of labor, material and use of construction equipment required to accomplish the change. As the value of the change increases, a declining scale will be used in negotiating the percentage of overhead and profit. Allowable percentages on changes will not exceed the following: 10% overhead and 10% profit on first $20,000; 7½% overhead and 7½% profit on next $30,000;

delineates the items included in overhead for which no separate allowance is made.[3] The issue raised by defendants' motion is whether these limitations in the prime contract are also limitations in the subcontract between Wells and Delta.

 Prefatory to a resolution of this issue is a discussion of the distinctive policy considerations underpinning the Miller Act. As stated by the Fifth Circuit in *Warrior Constructors Inc. v. Harders, Inc.*, 387 F.2d 727, 729 (5th Cir. 1967): "It is well established that the purpose of the Miller Act is to provide security for those who furnish labor and material in the performance of government contracts, and a liberal construction should be given the Act to accomplish this purpose." *See Liebman v. United States*, 153 F.2d 350 (9th Cir. 1946). Thus, the Act is not designed to benefit the prime contractor, but is rather for the especial protection of the subcontractor on a government construction contract. *See United States v. Alpha–Continental*, 273 F.Supp. 758, 774 (E.D.N.C.1967), *aff'd*, 404 F.2d 343 (4th Cir. 1968), *cert. denied*, 395 U.S. 922, 89 S.Ct. 1774, 23 L.Ed.2d 239 (1969). Accordingly, to fulfill this statutory intent, "the courts do not favor finding that a subcontractor has contractually abandoned his rights under the act." *H. W. Caldwell & Son, Inc. v. United States*, 407 F.2d 21 (5th Cir. 1969). Supplementing this judicial interpretation of Miller Act subcontracts is the general principle that public contracts are strictly construed and nothing is added by implication. *See United States v. Guy H. James Construction Co.*, 390 F.Supp. 1193, 1206 (M.D.Tenn.1972), *aff'd*, 489 F.2d 756 (6th Cir. 1974). It is apparent, therefore, that courts are reluctant to incorporate into the subcontract provisions of the prime contract which adversely affect the Miller Act rights of the subcontractor.

As one example of this reluctance, it is generally held that a subcontractor is not subject to the "disputes clause" between the prime contractor and the government. *See e. g., United States v. Phoenix General Construction Co.*, 462 F.2d 1098 (4th Cir. 1972); *Beason Construction Co. v. Prepakt Concrete Co.*, 375 F.2d 977 (1st Cir. 1967); *Central Steel Erection Co. v. Will*, 304 F.2d 548 (9th Cir. 1962). Commonly dispositive in these decisions are the unique policy aspects of the Miller Act. *Compare J. S. & H. Construction Co. v. Richmond County Hospital Authority*, 473 F.2d 212 (5th Cir. 1973) (prime contract arbitration provision incorporated into subcontract in non–Miller Act case), *with H. W. Caldwell & Son, Inc. v. United States*, 407 F.2d 21 (5th Cir. 1969) (administrative remedies in disputes clause of prime contract held not incorporated into Miller Act subcontract without an express provision to that effect in the subcontract).

The emphasis is that the subcontractor's "right to sue on the surety bond is a right created by statute, and in absence of a novation or clear expression to the contrary, the contention that there has been a waiver or release of the right must fail." 387 F.2d at 729. While the issue in this case is not a waiver of the right to sue on the surety bond, incorporation of the prime contract changes clause would amount to a serious curtailment of the remedy ordinarily available to a Miller Act subcontract. The *Caldwell* Court recognized that "a general incorporation by reference of the terms of the principal contract ... refers only to the quality and manner of the subcontractor's work, not the rights and remedies he may have against the prime contractor." 407 F.2d at 23.

 Delta's subcontract provides in pertinent part that "the Subcontractor hereby agrees to be bound to the Contractor by the terms of the above Contract, general conditions, special conditions, plans, specifications, and addenda and to assume toward

---

5% overhead and 5% profit on balance over $50,000.

**3.** G–10A9 provides in full:

Overhead and contractor's fee percentages shall be considered to include insurance other than mentioned herein, field and office supervisors and assistants, watchman, use of small tools, incidental job burdens, and general home office expenses, and no separate allowance will be made therefor.

the Contractor all the obligations and responsibilities that the Contractor, by those documents, assumes toward the Owner." No express provision is made incorporating the prime contract changes clause and its supplement for extra work payment into the subcontract. The rationale of the Miller Act cases would seem to preclude applying the changes clause to the subcontractor through incorporation by reference. As Judge Pickett stated in *Fanderlik–Locke Co. v. United States*, 285 F.2d 939, 943 (10th Cir. 1960): "[S]ubcontract references ... to the 'general conditions' of the prime contract [and] not the 'general provision' ... relate generally to performance of the subcontract according to specifications, not to the settlement of disputes, or the subcontractor's right to sue under the Miller Act." Accordingly, defendants' motion to strike certain damages claimed in Count I of plaintiff's complaint is denied.

## II

Count II of plaintiff's complaint states a claim for damages computed under the "total cost" approach. Defendants seek to dismiss this Count on the basis that it fails to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6).

The total cost method for ascertaining damages "has been used when actual costs for the change are unavailable and there is no acceptable estimate of the costs involved in the change. Under this method, the contract price is subtracted from the total cost of performance and the difference is considered the amount of the change." Nash & Cibinic, *supra* note 1, at 933. Thus, Method II of Delta's revised claim states a total cost of performance at $464,715.45 and a contract price at $267,471.08; the difference of $197,244.37 is the amount Delta claims due.

■ The United States Court of Claims has established four prerequisites for the use of the total cost approach:

(1) the nature of the particular losses makes it impossible or highly impractical to determine them with a reasonable degree of accuracy;

(2) the plaintiff's bid or estimate was realistic;

(3) its actual costs were reasonable; and

(4) it was not responsible for the added expenses.

*WRB Corporation v. United States*, 183 Ct.Cl. 409 (1967); see *J. D. Hedin Construction Co. v. United States*, 171 Ct.Cl. 70, 347 F.2d 235 (1965); *F. H. McGraw & Co. v. United States*, 131 Ct.Cl. 501, 130 F.Supp. 394 (1955). Thus, central to allowance of the total cost method is whether alternative means exist to determine damages with a greater degree of particularity and accuracy.

■ Within this framework, the court must decide on defendants' motion to dismiss "whether in the light most favorable to plaintiff, and with every doubt resolved in his behalf, the complaint states any valid claim for relief." 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1357, at 601 (1979). In the present posture of this action, the Court is unable to conclude that Count II of Delta's complaint fails to state a possible claim for relief. Yet, the Court is also mindful of the threshold requirements for using the total cost method as listed in the *WRB Corporation* decision.

Accordingly, defendants' motion to dismiss Count II of plaintiff's complaint is denied subject to reconsideration by the Court at the time of plaintiff's case.

## III

■ A further contention raised in defendants' motion is that Delta is not entitled to prejudgment interest on its claim. Whether prejudgment interest is recoverable in a Miller Act case is determined by the law of the state in which the work was performed. *See United States v. Guy H. James Construction Co.*, 390 F.Supp. 1193, 1246 (M.D.Tenn.1972) *aff'd*, 489 F.2d 756 (6th Cir. 1974). "[S]uch interest, as authorized under state law, becomes part of the amount 'justly due' Miller Act claimants under 40 U.S.C. § 270b." *United States v. F. D. Rich Co., Inc.*, 439 F.2d 895, 905 (8th Cir. 1971).

Under Georgia law, prejudgment interest is required where the damages are liquidat-

ed. Ga.Code Ann. § 57–110 (1977). Prejudgment interest for unliquidated damages in a breach of contract action is governed by Ga.Code Ann. § 20–1408 (1977) which provides: "In all cases where an amount ascertained would be the damages at the time of the breach, it may be increased by the addition of legal interest from that time until the recovery." Construing section 20–1408, the Georgia Court of Appeals has stated: " 'In an action upon breach of contract, where the damages are not liquidated, interest is not recoverable as such; but the jury in their discretion may increase the immediate amount of damages found, by an allowance of interest.' " *Bennet v. Tucker & Pennington*, 32 Ga.App. 288, 293, 123 S.E. 165, 167 (1924) (quoting *Tifton etc. Ry. Co. v. Butler*, 4 Ga.App. 191, 60 S.E. 1087 (1908)); *see Norair Engineering Corporation v. Saint Joseph's Hospital, Inc.*, 147 Ga.App. 595, 249 S.E.2d 642 (1978).

Thus, when damages are unliquidated, the Georgia Court of Appeals has apparently relegated the award of prejudgment interest to the discretion of the jury. Plaintiff's claim for prejudgment interest, therefore, is not properly subject to a motion to strike.